# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-23-00856-CV

### R.R. and A.C., Appellants

### v.

### Texas Department of Family and Protective Services, Appellee

### FROM THE 340TH DISTRICT COURT OF TOM GREEN COUNTY
### NO. C-23-0001-CPS, THE HONORABLE ELIZABETH WATKINS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

R.R. (Father) and A.C. (Mother) appeal from the trial court's decree terminating their parental rights to Child, who was three years old at the start of the final hearing.[1] Father and Mother challenge the legal and factual sufficiency of the evidence supporting the best interest finding. *See* Tex. Fam. Code § 161.001(b)(2) (best interest requirement). Mother also asserts that the trial court violated her due process rights when the court allowed the hearing to continue even though she was absent from the second half of the hearing. We affirm the trial court's termination decree.

---

[1] For the Child's privacy, we will refer to them by an alias and to their family members by their relationships to them or by aliases. *See* Tex. R. App. P. 9.8(b)(2).

## BACKGROUND

On January 13, 2023, the Department filed a petition alleging neglectful supervision of Child by Mother, and the Department was subsequently granted temporary managing conservatorship on January 24, 2023. Child was placed with maternal grandparents throughout the underlying termination proceeding.

Father was subsequently arrested at the Department office on June 1, 2023, relating to previous criminal charges. Father pled guilty to tampering/fabricating physical evidence with intent to impair and possession with intent to deliver methamphetamine, and he was sentenced to seven years' imprisonment. Father remained imprisoned through the final hearing. Three days before the final hearing, Mother was arrested on theft charges and remained in jail until she posted bond and was released the day before the final hearing.

The final hearing, a bench trial, was held on December 13, 2023. Darcell Stewart, the Department caseworker, testified that Child was removed for neglectful supervision and neglect of medical care, explaining that Mother was not taking Child to medical appointments and was possibly "under the influence" while caring for Child. Stewart testified that since Child had been removed, Mother had not attended Child's medical and dental appointments.

Stewart testified that Mother had failed to complete almost all of her service plan. Mother did not provide a proof of income and failed to complete all individual counseling or parenting classes. Stewart testified that Mother had "missed more visits than actually" attended, that Mother was generally appropriate with Child during the intermittent visits she did attend, and that Child tended to act out for "up to two or three days" after such visits. Stewart estimated that Mother completed approximately seven parenting classes and had attended one of her psych evaluations. Mother failed to take all but one of her drug tests during the proceeding, and the

2

one oral swab drug test she did complete on November 17, 2023 (i.e., one month before trial), was positive for amphetamine and methamphetamine. Stewart testified that Mother was reminded that missed drug tests were presumed positive by the Department.

Stewart confirmed that she was aware of Mother's medical condition (epilepsy) and had been presented with documentation about the condition and Mother's prescribed medication (and its side effects). Stewart testified that Mother currently resides with a man, but Stewart had not been able to conduct a background check on him because Mother had not provided any identifying information. Stewart testified that Mother had failed to maintain contact with the Department throughout the case and that Stewart had been unable to "maintain or make that contact with her" for the two months before trial. Stewart testified that she had not been able to access or view Mother's home in recent months and that she did not know whether Mother could provide a safe and appropriate home for children because of the lack of contact. Stewart cautioned that she believed Mother would be a continuing danger if Child was returned, and she later confirmed that Mother's other children had been involved in a prior Department case and now resided with maternal grandparents. Mother's family service plan, which was admitted into evidence at the hearing, also noted that Mother "has prior CPS history for exposing her other children to multiple forms of maltreatment and dangers and drug use while pregnant."

Stewart confirmed that Mother was arrested for theft three days before the final hearing, but that Mother had posted bond and was released the day before the hearing. Stewart testified that Mother did not notify the Department of her arrest even though she was required by court order to notify the Department of any contact with law enforcement within twenty-four hours. Stewart testified that Mother had been arrested on two other occasions during the proceeding for "[g]oing off bond." A Tom Green County bailiff also testified that during a

3

courtesy pat down of Mother at a previous hearing, Mother repeatedly insisted she needed to use the restroom and, when allowed, the officer heard "a distinct noise of something being poured out into the water." Bailiff subsequently discovered an empty, but still wet, plastic container inside of Mother's knee-high socks. Bailiff confirmed she did not test the disposed-of substance and did not know exactly what happened in the bathroom stall but that bringing illegal substances or contraband into the county jail constitutes a crime.

Stewart testified that Father was living at paternal grandmother's residence when the termination proceeding began. She testified that Father was arrested at the Department office when he attended a visitation with Child on June 1, 2023. Stewart testified that it was reported Father attended the visitation with "something on his person," and she confirmed that Father had been incarcerated since his arrest and is currently serving a seven-year sentence.

Stewart testified that Father had failed to complete his family service plan, that Father did not maintain consistent contact through the case, and that Father did not attend any visitations with Child except for the one at which he was arrested. Stewart testified that Father had failed to provide proof of employment, disability, or any form of income demonstrating he could provide for Child. She testified that while incarcerated, Father has not attended any drug assessments, counseling, or therapy, although she did concede Father had completed several chapters of a parenting course. Stewart testified that Father had a diagnosis of ADHD, methamphetamine dependence, and heroin use disorder. Stewart testified that Father has a criminal history related to family violence, although she has not personally witnessed threatening or aggressive behavior directed "personally towards [her]." She testified that Father had provided some letters for Child during his incarceration. Stewart confirmed Father requested

4

Child be placed with paternal grandmother, but the Department "did not feel that was appropriate at the time" because paternal grandmother was on parole.

Stewart testified that Child had been placed with maternal grandparents throughout the case and that Child was "thriving" in the placement. She testified that Child's siblings are also placed with maternal grandparents and Child is now up to date on all medical and dental needs. Stewart expressed that termination of Mother's and Father's parental rights was in the best interest of Child.

The trial court recessed for lunch, and when the participants returned, the trial court noted that Mother was not present. Maternal Grandfather then testified, stating that Mother is thirty-five years old, confirmed Mother has epilepsy, and explained that Mother has had substance abuse issues "[o]ff and on for over eight years." He testified that three of Mother's children are in his care, including Child, and that the other children were placed into his care because Mother's previous living situation was "just a bad situation." Maternal Grandfather testified that, when this proceeding began, Mother was not taking Child to medical appointments, that maternal grandparents took Child to medical appointments, and that in response Mother "[w]ould get mad for whatever reason and then just block us out." Maternal Grandfather clarified that Mother struggled with substance abuse of methamphetamine and marijuana, and he confirmed that Mother was using when Child was removed by the Department. He also testified that the jail photograph from Mother's most recent arrest showed physical indicators similar to other times when Mother has been using drugs, such as having "pimples, red spots all over her face, [and a] rash" that she gets when "she's using real heavy." He later confirmed that Mother was subjected to domestic violence by a previous partner, that her behavior changed after her time with that partner, and that Mother was affected by a combination of drugs and her medical

5

condition. He testified that he believed termination was in Child's best interest, that he and grandmother are committed to care for and adopt Child, and that they can provide a safe, drug-free household.

The Department then rested its case. Mother had still not returned to the hearing, and Mother's counsel did not recall any other parties as witnesses. Father then testified, stating that he had been incarcerated since June 1, 2023; that he took a plea deal; and that he was eligible for parole approximately two months after the hearing. He confirmed he would be on mandatory supervision on parole and would not be allowed to sell drugs. Father testified that he completed two classes relating to substance abuse and anger management, and that he had work experience in masonry. Father testified that he loves Child and after he is released, "I know that I could lead a different road, and I know I'm going to be a good father to him."

Father denied he had drugs on him when he was arrested on June 1, 2023, and he clarified that his arrest was for a 2020 manufacturing and delivering charge. Medical records admitted into evidence memorialized that Father had told hospital staff during the pending termination case that he used heroin twice a day and methamphetamine once a day and that he liked "the feeling of smoking ice and wanted to continue chasing that feeling." Father did not recall that he made those statements to the hospital staff. Father testified that instead he had been clean of heroin for two years and had not used methamphetamine for at least seven months, although he had used methamphetamine after Child was born. Father testified that he was sober starting one year before Child was born, and he maintained his sobriety for approximately eight months afterwards, but then he returned to drug use because he and Mother ended their relationship.

6

After the close of Father's testimony, the trial court again noted that Mother was not present. The parties proceeded to closing arguments, during which the attorney ad litem stated that Child has "done very well" with maternal grandparents, has shown improvements with behavior and listening, and has had stability and constant support from grandparents. The CASA volunteer similarly stated that Child has had positive changes since placement with maternal grandparents, and that those changes "are because [they have] been there."

At the end of the hearing, the trail court found by clear and convincing evidence that statutory grounds (E) and (O) supported terminating Mother's parental rights, and that grounds (E), (O), and (Q) supported terminating Father's rights. *See* Tex. Fam. Code § 161.001(b)(1)(E) (endangering conduct), (O) (failing to comply with court-ordered family service plan), (Q) (engaging knowingly in criminal conduct). The trial court also found that termination of each parent's rights was in Child's best interest. *Id.* § 161.001(2) (best interest requirement). The court thereafter signed a final termination order consistent with its oral ruling on January 2, 2024. Both parents have now appealed.

**STANDARD OF REVIEW**

To terminate the parent-child relationship, a court must find by clear and convincing evidence that (1) the parent has committed one of the enumerated statutory grounds for termination and (2) termination is in the child's best interest. Tex. Fam. Code § 161.001(b). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *Id.* § 101.007.

7

In this context, "[t]he distinction between legal and factual sufficiency lies in the extent to which disputed evidence contrary to a finding may be considered." *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018). When evaluating legal sufficiency of the evidence, we consider whether "a reasonable factfinder could form a firm belief or conviction that the finding was true" when the evidence is viewed in the light most favorable to the factfinder's determination and undisputed contrary evidence is considered. *Id.* at 631. When evaluating factual sufficiency of the evidence, we consider whether "in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *Id.* We must "provide due deference to the decisions of the factfinder, who, having full opportunity to observe witness testimony first-hand, is the sole arbiter when assessing the credibility and demeanor of witnesses." *In re A.B.*, 437 S.W.3d 498, 503 (Tex. 2014).

However, "[a]n appellate court's review must not be so rigorous that the only factfindings that could withstand review are those established beyond a reasonable doubt." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). "While parental rights are of constitutional magnitude, they are not absolute." *Id.* "Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *Id.*

## DISCUSSION

Father and Mother challenge the sufficiency of the evidence supporting the best interest finding against each of them. Mother also argues that proceeding with the hearing in her absence constituted a due process violation. We address each in turn.

8

*Best interest finding*

In Mother's first issue and Father's sole issue, the parents challenge the trial court's finding that termination of each of their rights was in Child's best interest. "[T]here is a strong presumption that the best interest of a child is served by keeping the child with a parent." *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). "In parental-termination proceedings, [the Department's] burden is not simply to prove that a parent should not have custody of [the] child; [the Department] must meet the heightened burden to prove, by clear and convincing evidence, that the parent should no longer have any relationship with the child whatsoever." *S.B. v. Texas Dep't of Fam. & Protective Servs.*, 654 S.W.3d 246, 255 (Tex. App.—Austin 2022, pet. denied) (quoting *In re D.L.W.W.*, 617 S.W.3d 64, 81 (Tex. App.—Houston [1st Dist.] 2020, no pet.)).

We may consider several factors to determine whether termination is in a child's best interest, including: the child's wishes, the child's emotional and physical needs now and in the future, any emotional or physical danger to the child now and in the future, the parenting abilities of any parties seeking access to the child, programs available to help those parties, plans for the child, the stability of any proposed placement, any evidence that the parent-child relationship is improper, and any excuses for the parent's conduct. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see also In re A.C.*, 560 S.W.3d at 631; *S.B.*, 654 S.W.3d at 255. The party seeking termination has the burden of establishing that termination is in the child's best interest. *See In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). The set of factors is not exhaustive; although one factor is not necessarily dispositive, in some instances evidence of a single factor may suffice to support the best interest finding. *See Holley*, 544 S.W.2d at 372; *see also In re C.H.*, 89 S.W.3d at 27; *S.B.*, 654 S.W.3d at 255. Ultimately, the *Holley* factors focus on the

9

child's, not the parents', best interest. *In re C.L.C.*, 119 S.W.3d 382, 399 (Tex. App.—Tyler 2003, no pet.). Evidence proving one or more statutory grounds for termination can be probative evidence that termination is in the best interest of the child. *In re C.H.*, 89 S.W.3d at 28.

As to Mother, she was arrested for theft three days before the final hearing and two other times during the pending termination proceeding for "[g]oing off bond." *In re A.J.E.M.-B.*, No. 14-14-00424-CV, 2014 WL 5795484, at *14 (Tex. App.—Houston [14th Dist.] Nov. 6, 2014, no pet.) (mem. op.) ("[E]vidence of continued criminal conduct, including several periods of incarceration, supports the trial court's best interest determination."). Maternal Grandfather testified that Mother's jail photograph from that arrest showed physical indications of drug abuse. Stewart testified that Mother missed more visits than she attended with Child and that Mother had not visited Child since November 2023. *N.K. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00028-CV, 2022 WL 2673236, at *8 (Tex. App.—Austin July 12, 2022, no pet.) (mem. op.) ("[S]tability and permanence are paramount considerations in evaluating the needs of a child."). Mother also failed to provide any proof of income and failed to maintain contact with the Department throughout the case, including in the two months leading up to the final hearing. Stewart testified that although Mother was generally appropriate with Child during her intermittent visits with Child, Mother had failed to complete most of her services. *See A.C. v. Texas Dep't of Fam. & Protective Servs.*, 577 S.W.3d 689, 706 (Tex. App.—Austin 2019, pet. denied) (explaining that factfinder could reasonably infer from parent's failure to complete required services and failure to visit child "on a consistent, regular basis" that parent was "not ready, willing, or able to be a parent to the child").

Mother also failed to submit to most drug testing, which was considered presumptively positive by the Department, and the one drug test result of Mother's from

10

November 17, 2023 (i.e., one month before trial), was positive for amphetamine and methamphetamine. Maternal Grandfather also confirmed that Mother has struggled with substance abuse of methamphetamine and marijuana, that Mother was using at the time of Child's removal, and that Mother's substance abuse issues had been "[o]ff and on for over eight years." Bailiff also provided limited testimony about discovering a wet, plastic container inside of Mother's socks after hearing a "distinct noise of something being poured out" when Mother was allowed to use the restroom during a pat down. *See In re C.A.J.*, 122 S.W.3d 888, 893 (Tex. App.—Fort Worth 2003, no pet.) (explaining that "a parent's inability to provide adequate care for the child, lack of parenting skills, poor judgment, and repeated instances of immoral conduct may also be considered when looking at best interest").

Mother's family plan of service noted that she "has prior CPS history of exposing her other children to multiple forms of maltreatment and dangers and drug use while pregnant," and Stewart testified that Mother had lost her rights to her other children in prior Department cases. *See In re S.B.*, 597 S.W.3d 571, 586 (Tex. App.—Amarillo 2020, pet. denied) (explaining that long-running history with Department indicates "that similar conduct will occur in the future"). Stewart testified that she could not know whether Mother's home was safe and appropriate for children because of Mother's repeated failures in staying in contact with the Department, especially in the months leading up to the final hearing. Mother also resided with a male individual who had a criminal history of theft, who was arrested at the same time as Mother, and who Stewart was unable to conduct a full background check on. There was testimony reflecting that Child loved Mother, that Mother was diagnosed with epilepsy, and that Mother began using drugs after suffering domestic violence by previous partner, *see S.B.*, 654 S.W.3d at 255 (weighing evidence of excuses for parent's conduct in determining best

11

interest), but a factfinder "was free to conclude" that such evidence did not outweigh or excuse Mother's continued drug use and repeated failures to communicate with the Department or demonstrate her parenting abilities in the present, *see, e.g.*, *In re H.R.*, 87 S.W.3d 691, 701 (Tex. App.—San Antonio 2002, no pet.) (holding evidence sufficient to sustain rejection of proffered excuses where parent failed to take responsibility for conduct).

As to Father, the trial court heard testimony that Father was arrested during the underlying removal proceeding, that he entered a plea agreement and was sentenced to seven-years' imprisonment during the pending termination proceeding, and that Father was currently incarcerated during the final hearing and would not be eligible for parole until no earlier than two months after the hearing. *See J.G. v. Texas Dep't of Fam. & Protective Servs.*, 592 S.W.3d 515, 525 (Tex. App.—Austin 2019, no pet.) ("[A] trier of fact may measure a parent's future conduct by his past conduct and determine whether termination of parental rights is in the child's best interest." (quoting *In re B.R.*, 456 S.W.3d 612, 616 (Tex. App.—San Antonio 2015, no pet.))). Stewart also testified that Father did not complete his required services, in part due to his incarceration. *See A.C.*, 577 S.W.3d at 706. Stewart further testified that Father had not maintained contact with Child during the case other than sending some letters and attending the single June visitation at which Father was arrested. Stewart also confirmed that Father has a criminal history related to family violence, although she had not personally witnessed threatening or aggressive behavior directed "personally towards [her]."

Father was diagnosed with ADHD, a methamphetamine dependence, and a heroin use disorder. Medical records indicated that Father told hospital staff that he used heroin twice a day and methamphetamine once a day, and Father told hospital staff that he liked "the feeling of smoking ice and wanted to continue chasing that feeling." Father claimed he did not recall

12

telling hospital staff that information and he testified that he was clean from heroin for two years and methamphetamine for seven months. *See In re A.B.*, 437 S.W.3d at 503. Although Father denied he possessed drugs at the time he was arrested on June 1, 2023, at the Department's offices, Father conceded that he returned to drug use after he split up with Mother and that he used methamphetamine after Child was born. Father also did not have any verified income source—only describing experience in masonry—and Stewart testified that she had accessed Father's place of residence only once prior to his incarceration. Father testified that after his release, "I know that I could lead a different road, and I know I'm going to be a good father to him," but a trial court "is not bound to accept the truth or accuracy of a parent's testimony, either as to past actions or future intentions." *In re D.M.*, 452 S.W.3d 462, 472 (Tex. App.—San Antonio 2014, no pet.).

In contrast, Child had been placed with maternal grandparents throughout the proceeding and was "thriving" in the placement. Child's siblings were also placed with them, and Child was now up to date on all medical and dental needs. Maternal Grandfather testified that he believed termination was in Child's best interest, that maternal grandparents are committed to caring for and adopting Child, and that they can provide a safe, drug-free household. The Attorney Ad Litem noted that Child has "done very well" with maternal grandparents, has shown improvements with behavior and listening, was eating well, and had stability and constant support from grandparents. The CASA volunteer similarly testified that Child had positive changes since the placements "because [they have] been there."

Given the evidence of the parents' continued drug abuse, failure to complete the majority of their services, and their inconsistent and sporadic attempts to visit or contact Child, the trial court could have reasonably concluded that such actions "sp[oke] volumes about [their]

13

parenting skills" and suggested "a substantial likelihood" that the parents "would be a danger to the [Child] in the future or put them in a possibly harmful situation." *In re X.R.L.*, 461 S.W.3d 633, 640 (Tex. App.—Texarkana 2015, no pet.). Taken together, the trial court could have reasonably concluded that neither parent was "willing and able to provide the child with a safe environment," Tex. Fam. Code § 263.307(b), which is "a primary consideration in determining best interest." *J.G. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00790-CV, 2023 WL 3634364, at *8 (Tex. App.—Austin May 25, 2023, no pet.) (mem. op.).

Accordingly, we conclude that the trial court could have reasonably believed that termination was in Child's best interest. *See In re C.H.*, 89 S.W.3d at 27. Moreover, there is not any disputed evidence that is so significant as to prevent the district court from forming that firm conviction. *See In re A.C.*, 560 S.W.3d at 630. We conclude that the evidence is legally and factually sufficient to support the district court's finding that termination of Father's and Mother's parental rights was in the best interest of Child. *See E.G. v. Texas Dep't of Fam. & Protective Servs.*, No. 03-22-00469-CV, 2022 WL 17970222, at *11 (Tex. App.—Austin Dec. 28, 2022, no pet.) (mem. op.). We overrule Mother's first issue and Father's only issue.

### Due process complaint

In her second issue, Mother for the first time on appeal argues that the trial court violated her due process rights by allowing the final hearing to continue during her absence from the latter half of the hearing. A parent in a termination proceeding must raise constitutional complaints, including lack of due process, in the trial court to preserve error for appeal. *T.D. v. Texas Dep't of Fam. & Protective Servs.*, 683 S.W.3d 901, 910 (Tex. App.—Austin 2024, no pet. h.); *In re L.N.C.*, 573 S.W.3d 309, 327 (Tex. App.—Houston [14th Dist.] 2019, pet. denied).

14

This is because "[t]he preservation rules themselves satisfy due process." *T.D.*, 683 S.W.3d at 910; *see also In re B.L.D.*, 113 S.W.3d 340, 353 (Tex. 2003) ("In termination cases, judicial economy is not just a policy—it is a statutory mandate. . . . Appellate review of potentially reversible error never presented to a trial court would undermine the Legislature's dual intent to ensure finality in these cases and expedite their resolution."). Accordingly, appellant must have "made to the trial court by a timely request, objection, or motion" a statement of "the grounds for the ruling that the [now-appellant] sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context." Tex. R. App. P. 33.1(a)(1)(A). "An objection at trial that does not comport with a point of error on appeal preserves nothing for review." *In re M.M.W.*, 536 S.W.3d 611, 613 (Tex. App.—Texarkana 2017, no pet.) (quoting *Anderson v. Snoddy*, No. 06-14-00096-CV, 2015 WL 5634564, at *11 (Tex. App.—Texarkana Sept. 25, 2015, pet. denied) (mem. op.)).

As the hearing was set to restart after a lunch break, the trial court noted on the record that Mother was not present for the afternoon portion of the proceedings, and then the court called for questioning to continue. Mother's counsel did not object or ask for a continuance at that time. When the Department later rested its case and the trial court asked Mother's counsel whether he had any witnesses, Mother's counsel responded:

> Judge, I'm going to have a hard time. I didn't put in a witness list because the Department's names were the ones I was going to use, and my client has not returned since the recess. I realize the weather is unusual for San Angelo, being rainy, but I don't think it's so inclement that it would have prevented her to return, so I'm kind of stuck. I need to call my client as a witness.

The trial court ordered the bailiff to check outside the courtroom, and after the bailiff returned and confirmed Mother was not outside, Mother's counsel without objection indicated he did not

want to recall any parties. After the trial court heard all remaining witnesses for the other parties, the court again noted that Mother was not present and asked whether Mother's counsel wanted to do closing arguments at this time. In response, Mother's counsel stated "If the Court makes me, I guess I'll close, Judge. But I do have an argument." Mother's counsel thereafter made his closing argument, without making any objection or request for continuance.

Based on the record before us, Mother's counsel did not raise any timely request, objection, or motion to the trial court to pause proceedings because of Mother's absence; did not request a continuance; nor took any action to make the trial court aware with sufficient specificity that he was raising a due process complaint relating to Mother's absence or her medical condition. *See T.D.*, 683 S.W.3d at 910. Although on appeal Mother argues that she has a documented medical condition (epilepsy) and the trial court failed to determine whether Mother's medical condition caused her absence, nothing in the record demonstrates that Mother's counsel was attempting to raise a due process challenge premised on Mother's medical condition. *See In re L.M.I.*, 119 S.W.3d 707, 711 (Tex. 2003) (holding due process argument not preserved after "it was not apparent from the context that [the parent] was attempting to raise a due process challenge"); *see also In re Marriage of Tyeskie*, 558 S.W.3d 719, 726 (Tex. App.—Texarkana 2018, pet. denied) (explaining that appellate issue must correspond with complaint made at trial court level); *In re M.M.W.*, 536 S.W.3d at 613. Because Mother did not preserve any such complaint in the trial court, Mother's due process complaint has been waived and we do not reach the merits of the issue. *See T.D.*, 683 S.W.3d at 910.

16

## CONCLUSION

Having concluded there was legally and factually sufficient evidence supporting the best interest finding, we affirm the trial court's final decree terminating Father's and Mother's parental rights to Child.

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Smith and Theofanis

Affirmed

Filed: May 23, 2024